## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

KRISTIE NELSON,

                         Plaintiff,

v.

RICKITT BENCKISER, LLC,

                         Defendant.

Case No. 24-cv-60782

**CLASS ACTION COMPLAINT**

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kristie Nelson brings this class action lawsuit on behalf of herself and others similarly situated against Defendant Rickitt Benckiser, LLC ("Defendant").

### INTRODUCTION

1.       Plaintiff brings these claims to redress the economic harms caused by Defendant's sale of acne treatment drug products containing benzoyl peroxide ("BPO") without warning consumers that (1) the BPO in the products is at high risk of degrading, and in fact degrades, into benzene under normal use, handling, and storage conditions, and (2) said products contain benzene, which is a well-known human carcinogen.

2.       Defendant is a leading seller of consumer health products, including products to treat acne.  It sells acne products under its brand Clearasil.  Clearasil brand products which the Defendant sells to the public as a treatment for acne vulgaris are formulated with BPO, along with other inactive ingredients. Before being sold to the public, the products must be made in conformity with current good manufacturing practices and must conform to quality, safety, and purity specifications. The Defendant's acne products ("BPO Products") did not.

3.       All the BPO Products sold by the Defendant decompose into benzene rendering

1

them materially different than advertised in that they contain unsafe levels of benzene. The Products should not contain benzene, nor degrade into benzene, except under extraordinary circumstances.[1]

4.     All the BPO Products sold by the Defendant decompose into benzene rendering them materially different than advertised in that they contain unsafe levels of benzene.

5.     Benzene is a known human carcinogen. There is a well-established consensus within the medical and scientific community that benzene exposure, even in low amounts, increases the risk of blood cancers and other adverse effects.

6.     In 2023, Valisure, LLC (an independent, accredited laboratory that has developed analytical methods for testing consumer products for public safety) tested a representative sample of BPO and non-BPO products and found that the products formulated with BPO had dangerous levels of benzene, many multiple times higher than allowed.[2] Valisure tested the BPO Products at temperatures common during consumer use, handling, and storage.[3] Valisure's testing revealed benzene levels as high as 1600 parts per million (ppm).[4] Even more concerning, Valisure also found that benzene was released into the surrounding air even when the BPO Products' packaging was closed, raising concerns for inhalation exposure.

---

[1] *See* Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* at p. 5, https://www.fda.gov/media/71737/download ("Solvents in Class 1 (Table 1) should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted as shown in Table 1, unless otherwise justified."). Per the FDA's guidance, the amount of benzene in a product should be less than 2 parts per million. *Id.*

[2] Valisure's FDA Citizen's Petition on Benzoyl Peroxide (March 6, 2024).

[3] *Id.*

[4] *Id.* at 17.

7.      In the non-BPO products tested by Valisure, benzene was not present, even at trace levels.

8.      As a result of the testing, Valisure filed a FDA citizen's petition on March 5, 2024, demanding an immediate recall of products containing BPO.

9.      The high levels of benzene found in BPO acne treatment products as well as research in academic literature dating back to 1936 demonstrating that BPO can degrade directly into benzene, led Valisure to conduct a stability study on a diverse market sweep of BPO products and formulations.

10.     Valisure tested 66 acne treatment products containing BPO, including Clearasil, incubating them at 50°C[5] for 18 days, and measuring the benzene levels at days 0, 4, 10, 14, and 18. Every product demonstrated substantial instability of BPO and a propensity to form concerningly high levels of benzene in only 18 days.  It follows that the BPO Products Defendant sold under its Clearasil brand to the Plaintiff and proposed Class Members have degraded into benzene, and that these BPO Products contain unsafe amounts of benzene.

11.     Despite the fact that the BPO Products contain high levels of benzene, Defendant has never listed benzene among the ingredients or anywhere on the BPO Products' labels, containers, advertising or on its websites. Defendant never even warned that the BPO Products were at risk of benzene contamination. This is, of course, unsurprising, as such a disclosure would have devastated the sales of the Products.

12.     Defendant, as the developer, maker, distributor, or seller of the BPO Products, knew

---

[5] Valisure notes that 50°C is "not only a reasonable temperature that the product may be exposed to during distribution and handling by consumers but is an accepted incubation temperature used by the pharmaceutical industry for performing accelerated stability studies with a duration of at least 3 months." Citizen Petition at 18-19 (internal citations and quotations omitted).

or should have known that the BPO Products contain and/or degraded into benzene when exposed to expected consumer use, handling, and storage conditions. Though not commonly known or understood by consumers, such as Plaintiff, BPO has long been known and understood within the scientific community to degrade into benzene.[6]

13.    Defendant knew or should have known that the BPO in the acne products it sold to the Plaintiff and Proposed Class under the Clearasil brand would degrade into benzene.

14.    Defendant misled Plaintiff and Proposed Class by representing the BPO Products only had the ingredients listed and—by omission—did not contain benzene.

15.    Defendant also misled Plaintiff and Proposed Class by representing the BPO Products were safe while concealing material health and safety information known to them, primarily that the BPO Products either contained benzene or would degrade to benzene under normal consumer conditions.

16.    Defendant further misled Plaintiff and Proposed Class by giving the BPO Products long expiration dates of 2-3 years, affirming to consumers that the BPO Products were safe for use for years, when Defendant knew or should have known that the BPO in the products would degrade into benzene far sooner than that.

17.    Defendant's statements and omissions of material health and safety information unreasonably placed Plaintiff and Proposed Class at risk of exposure to benzene without their knowledge and consent. Defendant's statements about the BPO Products were not only false and misleading, but they were also blatantly and intentionally deceptive.

18.    As a result of Defendant's misconduct and consumer deception, the Plaintiff and

---

[6] Erlenmeyer, H. and Schoenauer, W. (1936), Über die thermische Zersetzung von Di-acyl-peroxyden. HCA, 19: 338-342. https://doi.org/10.1002/hlca.19360190153 (https://onlinelibrary.wiley.com/doi/10.1002/hlca.19360190153)

4

Proposed Class have been economically harmed, as they purchased a product—one containing a deadly human carcinogen—that they otherwise would never have purchased.

19.     This Class Action is necessary to redress harms caused to Plaintiff and members of the Proposed Class, each of whom bought the BPO Products for personal use believing them to be safe and only containing the ingredients listed on the BPO Products' labels, containers, advertisement, and on Defendant's websites. This Class Action is further necessary to expose Defendant's ongoing consumer fraud and to enjoin Defendant from continuing its misconduct and deception to protect the public.

20.     Plaintiff brings this Class Action on behalf of herself, and on behalf of those similarly situated, and seeks to represent a Class of consumers who purchased Defendant's BPO Products in Florida.  Plaintiff seeks damages, reasonable attorneys' fees and costs, interest, restitution, other equitable relief, including an injunction and disgorgement of all benefits and profits Defendant received through its misconduct.

21.     Throughout this Complaint, references to federal law and FDA regulation are merely to provide context and are not intended to raise a question of law. All claims alleged in this Complaint arise out of violations of state law, which in no way conflict, interfere with, or impose obligations that are materially different than those imposed by federal law.

## PARTIES

22.     Plaintiff Kristie Nelson, an adult resident of Broward County, Florida, purchased the Defendant's BPO Products in Broward County, Florida for many years, including within the last year. She has suffered economic damages as a result of Defendant's breaches and wrongful conduct, as alleged, including (but not limited to) its violations of the consumer protection laws alleged herein. Plaintiff Nelson never would have purchased Defendant's BPO Products had

Defendant warned about the presence of benzene or that its products could degrade into benzene.

23.     Defendant Rickitt Benckiser, LLC, is a foreign limited liability company with its principal place of business in Parsippany, NJ. Upon information and belief, its single member is Reckitt Benckiser Group plc, which is a citizen of the United Kingdom. It may be served via its registered agent for service in Florida, which is CORPORATION SERVICE COMPANY, 1201 HAYS STREET, TALLAHASSEE, FL 32301-2525.

24.     Defendant sells and distributes BPO Products under the brand name Clearasil. At all relevant times, it conducted business and derived substantial revenue from its marketing, distributing, and selling of the BPO Products within the State of Florida and in this District.

25.     Defendant and its agents promoted, marketed, and sold the BPO Products in Florida and in this District. The unfair, unlawful, deceptive, and misleading advertising and labeling of the BPO Products were prepared and/or approved by Defendant and its agents and were disseminated by Defendant and its agents through labeling and advertising containing the misrepresentations alleged and disseminated uniformly through advertising, packaging, containers, websites, and social media.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this matter because there is (at least) minimal diversity and the amount in controversy exceeds $5 million, satisfying 28 U.S.C. § 1332(d)(2) for subject matter jurisdiction. This Court has supplemental jurisdiction over any state law claims under 28 U.S.C. § 1367.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendant conducts substantial and continuous business in this District.

28.     This Court has personal jurisdiction over the Defendant because Defendant transacts business in this District, has substantial aggregate contacts with the State of Florida, including in this District, and engaged in the misconduct alleged in Florida and in this District. That misconduct had a direct, substantial, reasonably foreseeable, and intended effect of injuring people in Florida and in this District.  Defendant purposely availed itself of the benefits of doing business in Florida.  It maintains a registered agent for service in this State.

GENERAL ALLEGATIONS

A.     <u>**Benzene Is a Deadly Carcinogen with No Safe Exposure Level.**</u>

29.     Benzene is a carcinogen that has been among the most studied toxins over the last 100 years due to its wide use during the industrial revolution, extreme danger, and known ability to cause cancer and death in humans and animals. The medical literature linking benzene to blood cancers is vast dating to the 1930s.[7]

30.     Benzene has no known safe level of exposure. Benzene causes central nervous system depression and destroys bone marrow, leading to injury in the hematopoietic system. The International Agency for Research on Cancer ("IARC") classifies benzene as a "Group 1 Carcinogen" that causes cancer in humans, including acute myelogenous leukemia ("AML"). AML is the signature disease for benzene exposure with rates of AML particularly high in studies of workers exposed to benzene.

---

[7] See Hamilton A., *Benzene (benzol) poisoning*, ARCH PATHOL, (1931):434-54, 601-37; Hunter FT, *Chronic exposure to benzene (benzol). Part 2: The clinical effects.* J. IND. HYG TOXICOL, (1939):21 (8) 331-54; Mallory TB, et al., *Chronic exposure to benzene (benzol).Part 3:The pathological results.* J. IND. HYG TOXICOL,(1939):21 (8) 355-93; Erf LA, Rhoads CP., *The hematological effects of benzene (benzol) poisoning.* J. IND. HYG TOXICOL, (1939):21 421-35; American Petroleum Institute, *API Toxicological Review: Benzene*, NEW YORK, (1948); Infante PF, Rinsky RA, Wagoner JK, et al., *Leukemia in benzene workers*, LANCET, (1977);2 (8028): 76-78.

31.     Benzene exposure is cumulative and additive. There is no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supra-linear, and additive fashion." According to the FDA, benzene in small amounts over long periods of time can decrease the formation of blood cells and long-term exposure through inhalation, oral intake, and skin absorption may result in cancers such as leukemia and other blood disorders.

32.     In 2022, the FDA issued a safety alert warning manufacturers of the risk of benzene contamination in certain products and components.[8] The FDA warned manufacturers that if any product or component was subject to deterioration, manufacturers must have re-testing procedures in place to ensure continued purity and stability of the degradable components. If any product in circulation was found to have benzene over 2 ppm, the FDA directed that drug manufacturers contact the FDA to discuss a voluntary recall.

33.     To date, to Plaintiff's knowledge, none of the Defendant's products containing BPO have been recalled due to benzene contamination.

34.     Defendant is in the business of selling skin care products, including products under the Clearasil brand to treat acne.

35.     In 2023, Valisure tested a representative sample of BPO and non-BPO products and found that the products formulated with BPO had dangerous levels of benzene, many multiple times higher than allowed.[9] Valisure tested the BPO Products at temperatures common during consumer use, handling, and storage.[10] Valisure's testing revealed benzene levels as high as 1600

---

[8] Federal Drug Administration. (Dec. 22, 2022). *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs*.

[9] Valisure's FDA Citizen's Petition on Benzoyl Peroxide (March 6, 2024).

[10] *Id.*

parts per million (ppm).[11] Even more concerning, Valisure also found that benzene was released into the surrounding air even when the BPO Products' packaging was closed, raising concerns for inhalation exposure. In the non-BPO products tested by Valisure, benzene was not present, even at trace levels.

36.     The high levels of benzene found in BPO acne treatment products as well as research in academic literature dating back to 1936 demonstrating that BPO can degrade directly into Benzene, led Valisure to conduct a stability study on a diverse market sweep of BPO products and formulations.

37.     Valisure tested 66 acne treatment products containing BPO, incubating them at 50°C[12] for 18 days, and measuring the benzene levels at days 0, 4, 10, 14, and 18. Every product demonstrated substantial instability of BPO and a propensity to form concerningly high levels of benzene in only 18 days.

**B.     Defendant Did Not Adequately Test Its BPO Products for Benzene.**

38.     Defendant did not adequately test its BPO Products before selling them to Plaintiff and Proposed Class.  Defendant was required to follow or ensure current good manufacturing practices ("CGMPs"), have scientifically sound specifications, and have test procedures and processes to ensure the safety of the BPO Products' components (both active and inactive ingredients) and the finished products. Both raw ingredient materials and finished batches must be

---

[11] *Id.* at 17.

[12] Valisure notes that 50°C is "not only a reasonable temperature that the product may be exposed to during distribution and handling by consumers, but is an accepted incubation temperature used by the pharmaceutical industry for performing accelerated stability studies with a duration of at least 3 months." Citizen Petition at 18-19 (internal citations and quotations omitted).

tested to confirm that they meet specifications for identity, strength, quality, and purity.[13] If testing results of either the raw materials or the finished products do not conform with the specifications, the product cannot be sold to the public. Defendant must also re-test any BPO Products which are subject to deterioration.[14]

39.     Defendant must also do stability testing to understand the "shelf life" of the BPO Products and to assign an appropriate expiration date. It is well known that certain chemical ingredients can degrade or change because of environmental and storage conditions, such as light, moisture, temperature, and humidity, or simply do to the passage of time. The required stability testing should cover all expected distributor and consumer storage, handling, and use conditions and must be done using "reliable, meaningful, and specific test methods."[15] If stability testing finds a drug product is not stable under expected storage or use conditions, degrades, or creates toxic byproducts, the product cannot be sold to the public.

40.     The CGMPs and stability test requirements are there to ensure products are safe for public use. These are the minimum requirements. Because the manufacturers are self-regulated, the FDA—and the consumers of the products— must rely on drug manufacturers, the public, and concerned citizens to report unsafe products.

41.     Defendant knew or should have known that the BPO in its Products degrades to benzene. Defendant knew that, because the chemical nature of BPO is not stable and would degrade when exposed to the environmental temperatures found in normal distributor and consumer use, handling, and storage conditions.

---

[13] 21 C.F.R. § 211.84 (1978); *see also* 21 C.F.R. § 211.160 (1978)

[14] 21 C.F.R. § 211.160(b)(1)(1978).

[15] 21 CFR 211.166.

42.     The degradation of BPO to benzene over time when exposed to heat has been well known for some time, and the process has been reported in the scientific literature as early as 1936.[16]

43.     The degradation of BPO to benzene was known or should have been known to Defendant. Defendant knew or should have known through its own research, development, formulation, manufacturing, and testing whether the BPO in its Products was chemically and physically stable. Defendant was required not only to test the BPO Products for safety and stability before selling them, but also to monitor its internal practices, processes, and specification to make sure they kept pace with science and emerging methodologies. Defendant knew or should have known from expiration and stability studies examining the "shelf life" of the BPO Products that the degradation of BPO to benzene took place because of normal and expected environmental, use, and storage conditions.

44.     Defendant knew or should have known the BPO Products would be handled, used, and stored under various temperatures that affect chemical stability. Defendant knew or should have known that it would distribute and sell the BPO Products in varying storage and distribution conditions, and that the products, once sold, would be stored by consumers in handbags, backpacks, bathrooms, showers, lockers, and in vehicles during warm months where the BPO Products would be exposed to heat.

45.     Defendant knew or should have known that consumers would apply the benzene contaminated Products to their faces and bodies and would also use the BPO Products in heated showers as scrubs and washes. Defendant knew or should have known that the BPO Products

---

[16] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden,* HELU. CHIM. ACTA, 19, 338 (1936).

would be used and applied to the skin at normal body temperatures, and elevated temperatures following showers, baths, after physical activity, and after the BPO Products sat in warm temperatures or hot vehicles.

46.     The storage, use, and handling conditions of the BPO Products were known or should have been known to Defendant before its Products containing BPO were sold to Plaintiff and Proposed Class. Defendant knew or should have known that the BPO in these Products would degrade to benzene under these conditions. Defendant further knew or should have known that, because of the known degradation of BPO to benzene, its Products with BPO were contaminated with benzene by the time they reached consumers, but they sold them to Plaintiff and Proposed Class anyway and without any warning of the benzene contained within them.

47.     In 2020, the FDA started working with companies to identify benzene in products, which resulted in product recalls of hand sanitizers, sunscreens, and deodorants. Defendant were aware or should have been aware of benzene contamination in other BPO products on the market when they marketed and sold its BPO Products to Plaintiff and Proposed Class, but did not test the BPO Products for benzene contamination.

**C.     Defendant exposed Plaintiff and Proposed Class to Benzene without their knowledge or consent.**

48.     Despite the fact that its BPO Products contain benzene, Defendant did not list benzene among the Product's ingredients, on the BPO Products' label or container, or anywhere in their advertising or on their websites. Defendant did not—and still does not, to Plaintiff's knowledge—warn that the BPO Products contain benzene, are at risk of benzene contamination, or that the product could cause consumers to be exposed to benzene even while the product remains sealed.

49.     As noted above, benzene is a known human carcinogen which is heavily regulated

to protect human health, and should not be in drug products, especially ones such as acne treatment which are used daily by children and teenagers for many years. FDA specifically prohibits benzene from being used to make products because any "benefit" it may impart is vastly outweighed by its toxicity and harmful environmental effects. FDA allows one exception to this otherwise blanket prohibition, and that is when the use of benzene in a product is unavoidable, and the product has significant therapeutic advantages for the consumer. Even in that rare instance, benzene in a product is restricted to 2 ppm. Defendant's acne treatment products do not meet this rare exception.

50.     Plaintiff and Proposed Class were exposed to benzene from Defendant's BPO Products through inhalation and dermal absorption. Benzene can be absorbed into the body via inhalation, skin absorption, ingestion, and/or eye contact. Plaintiff and the Class applied Defendant's BPO Products to areas of the skin including face, neck, chest, and back one to three times per day, and used the BPO Products as washes or scrubs in heated showers. Plaintiff and the Class were also exposed to benzene leaked from contaminated BPO Products.

51.     Defendant represented to the Plaintiff and Proposed Class that each of its BPO Products had only the ingredients listed on the label and package, but failed to identify benzene anywhere on the BPO Products' label, container, or packaging.

52.     Defendant's statements about the BPO Products' ingredients were false, deceptive, and misleading. Defendant's statements were meant to convey to Plaintiff and Proposed Class the message that the BPO Products were safe and did not contain carcinogens, such as benzene. Defendant made these statements and omitted benzene from all advertising, labeling, and packaging when they knew or should have known the statements were false, misleading, and deceptive. Reasonable consumers, relying on Defendant's statements reasonably believed the BPO Products were safe and did not contain benzene.

G.    **Punitive Damages Allegations.**

53.    Defendant's conduct was done with malice and reckless disregard for human life. Defendant knew the BPO Products degraded to benzene when exposed to heat under normal consumer use, handling, and storage conditions. Defendant further knew that benzene is a known human carcinogen that is not supposed to be in the BPO Products due to the grave risk of harm to consumers. Defendant disregarded this information and the known risks of benzene exposure and deliberately omitted benzene from the list of ingredients, the BPO Products' labels, and its social media and websites where information about the BPO Products may be found. Defendant consciously and deliberately crafted the BPO Products' marketing, labels, packaging, containers, and warnings intending to mislead Plaintiff and Proposed Class to believe the BPO Products were safe and carcinogen-free.

54.    Defendant was on notice of benzene findings in consumer and drug products leading to widely publicized recalls. Defendant was on notice of the FDA's concerns of benzene contamination in drug and consumer products and received, or should have been aware of, the FDA's 2022 directive to test Products for benzene contamination. Defendant disregarded these notices and continued to market and sell the BPO Products without testing them for benzene.

55.    Defendant knew its decisions and chosen course of conduct was risky and would cause consumers to be exposed to benzene. Defendant's' conduct was not by accident, but was deliberate, calculated, and informed. Defendant knew they could sell more BPO Products and earn more money by concealing material human health and safety information. Defendant further knew that testing the BPO Products for benzene would yield findings of benzene requiring recalls and/or a shutdown of production causing significant losses of income. Defendant's conduct and concealment of material health information was done to further its own monetary gain and with

conscious disregard of the Plaintiff and Proposed Class.  Defendant's conduct was intentional, calculated, blatantly deceptive, unscrupulous, and offensive to consumer health and public policy.

56.     To redress the harms caused by Defendant's conduct, Plaintiff and Proposed Class seek punitive damages against the Defendant.

## PLAINTIFF-SPECIFIC ALLEGATIONS

57.     Plaintiff Nelson, for her personal use, purchased Defendant's BPO Products in Darlington County, Florida for many years, including within the last year. She has suffered economic damages as a result of Defendant's breaches and wrongful conduct, as alleged, including (but not limited to) its violations of the consumer protection laws alleged herein. Plaintiff Nelson never would have purchased Defendant's BPO Products had Defendant warned about the presence of benzene or that its products could degrade into benzene.

58.     The Plaintiff and the Proposed Class have suffered an ascertainable economic loss because of Defendant's statements and misrepresentations in that they would not have purchased the BPO Products had they known of the benzene contained in them, information which the Defendant knew, or could and should have known, and either rectified or disclosed.

59.     Prior to filing this Complaint, Plaintiff Nelson, for herself and for the Proposed Class, served notice on the Defendant that it had breached warranties associated with its BPO Products, and that it had done so for the reasons alleged in this Complaint.

60.     Plaintiff Nelson brings these claims for herself and for Class of similarly situated persons in Florida who purchased the BPO Products in Florida.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS, CONCEALMENT, AND ESTOPPEL

61.     Each purchase of a BPO Product constitutes a separate act that triggers anew the relevant statute of limitations.

62.     Additionally, any applicable statutes of limitation have been tolled by (1) the delayed discovery doctrine, as Plaintiff and the putative class members (defined below) did not and could not—through no fault or lack of diligence—reasonably have discovered Defendant's conduct alleged herein until shortly before the filing of this Complaint; and (2) the fraudulent concealment doctrine due to Defendant's knowing, purposeful, and active concealment and denial of all facts alleged herein including but not limited to its knowledge that the BPO contained in its Products degrades to benzene.

63.     Defendant had exclusive knowledge that its BPO Products contained benzene and deceptively marketed its BPO Products to Plaintiff, members of the Class, and the public.

64.     Under the circumstances, Defendant had a duty to disclose the nature, significance, and consequences of the benzene contained in its BPO Products. Accordingly, Defendant is estopped from relying upon any statute of limitations.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this case on behalf of herself and all others similarly situated as a Class Action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiff seeks to represent a Class of Floridians who bought Defendant's BPO Products in Florida for their personal use.

66.     The Class does not seek damages for physical injuries, although each Plaintiff was physically harmed by being exposed to benzene.

67.     This is the definition of the Class: All persons in Florida who bought, for personal use and not resale, the BPO Products of the Defendant within Florida.

68.     Excluded from this Class are Defendant, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and affiliated companies; Class counsel and their employees; and the judicial officers assigned to the case, including their assigned or appointed

staff and their immediate families.

69.     This action has been brought and may be properly maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest and the proposed Class meets the class action requirements under Rule 23 of numerosity, commonality, typicality, and adequacy of representation.

70.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself, and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved.

71.     Numerosity. Plaintiff believes there are thousands of Class members in Florida, making the Class so numerous and geographically dispersed that joinder of all members is inconvenient and impracticable.

72.     Commonality. There are questions of law and fact common to all Class members that predominate over questions which affect only individual Class members. All Class members were deceived and misled by Defendant through the same advertising, online representations, labeling, and packaging, which do not mention benzene and misrepresent the characteristics, ingredients, and safety of the BPO Products. All Class members bought Defendant's BPO Products and have suffered an economic loss because of Defendant's deceptions, omissions, and breaches of warranties and statutory law. Thus, there is a well-defined community of interest in the questions of law and facts common to all Class members. Other common questions of law and fact in this dispute include, without limitation:

    a.  Whether Defendant's BPO Products degrade to benzene under common conditions of distribution, retail sale, and consumer handling, use, and storage.

    b.  Whether Defendant tested the BPO Products for benzene before selling them to

Plaintiff and Proposed Class.

c.  When Defendant knew or should have known the BPO Products degraded to benzene.

d.  When Defendant knew or should have known the BPO Products contain benzene.

e.  Whether Defendant's advertising, labeling included, omitting benzene was deceptive, fraudulent, or unfair.

f.   Whether Defendant's advertising omitting benzene was likely to deceive reasonable consumers.

g.  Whether Defendant's conduct violated the statutory consumer protection law of Florida.

h.  Whether Defendant breached the express and implied warranties for its BPO Products.

i.  Whether Defendant was unjustly enriched by purchases of the BPO Products by Plaintiff and Proposed Class.

j.  Whether Plaintiff and Proposed Class have been injured and if so, what is the proper measure of damages.

k.  Whether Plaintiff and Proposed Class have the right to economic damages including compensatory, exemplary, and statutory remedies for Defendant's misconduct.

l.  Whether Plaintiff and Proposed Class have the right to injunctive, declaratory, or other equitable relief and attorneys' fees.

73.   **Typicality**. Plaintiff's claims are typical of the claims of the Class because the claims arise from the same course of misconduct by Defendant, i.e., Defendant's false and

18

misleading advertising and its failure to discolsure benzene in the BPO Products. The Plaintiff and Proposed Class were all exposed to the same uniform and consistent advertising, labeling, and packaging statements Defendant made about the BPO Products. Because of the Defendant's misconduct, Plaintiff and Proposed Class were damaged and have incurred economic loss because of buying the BPO Products believed to be safe.

74.   **Adequacy**.   The Plaintiff will fairly and adequately represent and protect the interests of all Class members. Plaintiff has no interests antagonistic to the Class. Plaintiff hired attorneys experienced in the prosecution of consumer Class Actions, and Plaintiff intends to prosecute this action vigorously. Plaintiff anticipates no difficulty in the management of this litigation as a Class Action.

75.   **Superiority.** Finally, this Class Action is proper under Rule 23(b) because, under these facts, a Class Action is superior to other methods and is the most efficient method for the fair and efficient adjudication of the dispute. The Class has suffered economic damages because of Defendant's deceptive trade practices, false advertising, and omissions of material health and safety information. Because of the nature of the claims and the cost of the BPO Products, few, if any individuals, would seek legal redress against Defendant because the costs of litigation would far exceed any potential economic recovery. Absent a Class Action, individuals will continue to suffer economic losses for which they would have no remedy, and Defendant will unjustly continue its misconduct with no accountability while retaining the profits of its ill-gotten gains. Even if separate cases could be brought by individuals, the resulting multiplicity of lawsuits would cause undue hardship, burden, and expense for the Court and the litigants, as well as create a risk of inconsistent rulings across the country, which might be dispositive of the interests of individuals who are not parties. A Class Action furthers the important public interest of containing legal

expenses, efficiently resolving many claims with common facts in a single forum simultaneously, and without unnecessary duplication of effort and drain on critical judicial resources. The Class Action method presents far fewer management difficulties than individual cases filed nationwide and provides the benefit of comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I: BREACH OF EXPRESS WARRANTY

76.     Plaintiffs realleges and incorporates all other paragraphs in this Complaint and further alleges:

77.     Plaintiff, and each member of the Class, formed a contract with Defendant at the time Plaintiff and the other Class Members purchased the BPO Products. The terms of the contract include the promises and affirmations of fact made by Defendant on the BPO Products' packaging and through marketing and advertising, specifically that the BPO Products were safe to use and did not contain any benzene. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and members of the Class on the one hand and Defendant on the other hand.

78.     Defendant expressly warranted that its BPO Products were fit for ordinary use, were merchantable, and were not misbranded. Defendant's express warranties were reflected in each BPO Product's labeling, promotions, and marketing material, all of which uniformly identified BPO as the active ingredient and none of them identified benzene as an ingredient in Defendant's products. Defendant's product labeling and other materials were required to be truthful, accurate, and non-deceptive, but this was not the case as Defendant failed to disclose Plaintiff and members of the Class that its BPO Products contained benzene.

79.     At all times relevant Florida has codified and adopted the provisions of the Uniform

Commercial Code.  Uniform Commercial Code § 2-313 provides that an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the promise. Defendant sold the BPO Products as safe, pure, of good quality, and only containing the listed ingredients. Defendant's advertising, labels, containers, packaging, advertising, and online statements did not mention benzene, leading consumers to believe the BPO Products were safe for their ordinary use. Defendant's affirmations were uniformly made to Plaintiff and Class by Defendant in the BPO Products' advertising, labeling, packaging, and online statements and were part of the basis of the bargain between Defendant and the Plaintiff and Class.

80.    Defendant's affirmations and promises are unlawful. When Defendant marketed, distributed, and sold the BPO Products, Defendant knew, or should have known, the BPO Products degraded to benzene under normal and expected use, handling, and storage conditions. Defendant knew, or should have known, the BPO Products formed benzene and therefore did not conform to Defendant's express representations and warranties to consumers. Plaintiff and the Class purchased the BPO Products in reasonable reliance on Defendant's statements.

81.    Defendant breached its express warranty because Defendant's BPO Products were not of merchantable quality, not fit for the product's ordinary purpose, and did not conform to the standards generally applicable to such goods.

82.    Plaintiff has provided Defendant with notice of its breach of warranty on behalf of herself and all others similarly situated.

83.    Plaintiff and members of the Class were reasonably expected purchasers of the misbranded and deceptively labeled BPO Products.

84.    Because of Defendant's misconduct and breach of the express warranty, Plaintiff,

for herself and the Class, seeks recovery of economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendant from continuing its fraudulent business practices. The damages sought are ascertainable, uniform to the Class and can be measured and returned to the Class members.

## COUNT II: BREACH OF IMPLIED WARRANTY

85.     Plaintiff realleges and incorporates paragraphs 1 through 75 above as if fully set forth herein and further alleges:

86.     Plaintiff, and each member of the Class, formed a contract with Defendant at the time Plaintiff and the other Class Members purchased the BPO Products. The terms of the contract include the promises and affirmations of fact made by Defendant on the BPO Products' packaging and through marketing and advertising, specifically that the BPO Products were safe to use and did not contain any benzene. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and members of the Class on the one hand and Defendant on the other hand.

87.     At all times relevant Florida has codified and adopted the provisions of the Uniform Commercial Code ("UCC").  Defendant is a merchant within the meaning of the UCC.

88.     Defendant's BPO Products constitute "goods" or the equivalent under the UCC. Defendant placed its BPO Products in sealed packaging or other closed containers and placed them on the market.

89.     Defendant, as sellers of the BPO Products, made implied warranties including warranting the BPO Products were of the same quality and purity represented on the labels, in advertising, and on Defendant's websites and in advertising. Defendant represented the BPO Products were fit for the ordinary purpose and conformed to the promises made on the containers,

labels, advertising, and websites that all ingredients were listed, and all warnings given.

90.    Defendant advertised its BPO Products as safe, when it knew, or should have known, the BPO Products degraded to benzene. Defendant did not list benzene as an ingredient or contaminant anywhere on the BPO Products or advertising. The BPO Products are not of the quality and purity represented by Defendant because the BPO Products degrade to benzene under normal use, handling, and storage conditions.

91.    Defendant breached its implied warranty because Defendant's BPO Products were not of merchantable quality, not fit for the product's ordinary purpose, and did not conform to the standards generally applicable to such goods.

92.    Plaintiff has provided Defendant with notice of its breach of warranty on behalf of herself and all others similarly situated.

93.    Defendant did not tell Plaintiff or any Class member the BPO Products were not fit for their ordinary use because the BPO Products, as advertised and sold by Defendant, degraded to benzene under normal and expected handling, use, and storage.

94.    Defendant's affirmations that the BPO Products were safe for use were uniformly made to the Plaintiff and Class in the BPO Products' advertising, labeling, and packaging, and on Defendant's websites, which were part of the basis of the bargain.

95.    Plaintiff and the Class purchased the BPO Products in reasonable reliance on Defendant's statements, affirmations, and omissions of material health and safety information.

96.    Defendant's BPO Products did not fulfill their intended purpose as, instead of purchasing a safe treatment for acne, Plaintiff and members of the Class received products containing benzene, a dangerous human carcinogen.

97.    Defendant's implied warranties were reflected in each BPO Product's labeling,

promotions, and marketing material, all of which uniformly identified BPO as the active ingredient and none of them identified benzene as an ingredient in Defendant's products. Defendant's product labeling and other materials were required to be truthful, accurate, and non-deceptive, but this was not the case as Defendant failed to disclose to Plaintiff and members of the Class that its BPO Products contain benzene.

98.     Plaintiff and the Class were the intended beneficiaries of any promises, affirmations, or warranties made by Defendant concerning the BPO Products, as they were the purchasers and end users of Defendant's BPO Products.

99.     Defendant's acts and omissions are ongoing and continue to cause harm.

100.    As a direct and proximate result of Defendant's misconduct, Plaintiff, for herself and the Class, seeks recovery of actual damages, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are uniform to the Class, and the actual damages can be measured and returned to consumers who bought Defendant's BPO Products for personal use.

**COUNT III: UNJUST ENRICHMENT**

101.    Plaintiff realleges and incorporates paragraphs 1 through 75 above as if fully set forth herein and further alleges:

102.    Defendant has unjustly profited from its deceptive business practices and kept the profits from Plaintiff and the Class, who purchased the BPO Products.

103.    Defendant requested and received a measurable economic benefit at the expense of Plaintiff and the Class as payment for the BPO Products. Defendant accepted the economic benefits knowing the economic benefit received was based on deception and omission of material human health and safety information.

104.     There is no utility in Defendant's misconduct and Defendant's enrichment from the misconduct is unjust, inequitable, unconscionable, and it is against the strong public policy to protect consumers against fraud.

105.     Because of Defendant's misconduct, Plaintiff, for herself and the Class, seeks recovery of actual damages, disgorgement of profits, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are uniform to the Class, and the actual damages can be measured and returned to consumers who bought Defendant's BPO Products for personal use.

## COUNT IV: FRAUD

106.     Plaintiff realleges and incorporates paragraphs 1 through 75 above as if fully set forth herein and further alleges:

107.     Defendant affirmatively misrepresented material facts, including, *inter alia*, the fact that that its BPO Products contain benzene.

108.     Defendant omitted material facts including, *inter alia*, that its BPO Products contain benzene.

109.     Defendant's actions had the effect of fraudulently inducing customers—including Plaintiff and members of the Class—to pay for Defendant's BPO Products, which Defendant knew or should have known contained a human carcinogen, benzene, and were misbranded. Plaintiff and members of the Class would not have purchased Defendant's BPO Products had they known the truth. Indeed, Plaintiff and members of the Class *could not* have purchased Defendant's BPO Products, because the benzene in them renders them illegal as distributed and sold.

110.     Defendant knowingly, or at least recklessly, represented that its BPO Products did not contain benzene through labeling, marketing, advertising, and promotion.

111.   Defendant knew, or reasonably should have known, that its misrepresentations were materially false or misleading, or that the omission of material facts rendered such representations false or misleading.

112.   Defendant knew, or had reason to know, that its misrepresentations and omissions would induce Plaintiff and members of the Class to purchase Defendant's BPO Products.

113.   Defendant's misrepresentations and omissions were material.

114.   Defendant actively concealed its misrepresentations and omissions from Plaintiff and members of the Class.

115.   Defendant intended its misrepresentations and omission to induce Plaintiff and members of the Class to purchase Defendant's BPO Products.

116.   But for these misrepresentations and omissions, Plaintiff and members of the Class would not have purchased Defendant's BPO Products.

117.   To the extent applicable, Plaintiff and members of the Class were justified in relying on Defendant's misrepresentations and omissions. The same or substantively identical misrepresentations and omissions were communicated to each member of the Class through, *inter alia*, product labeling and packaging, as well as Defendant's marketing and promotional material. No reasonable consumer would have purchased Defendant's BPO Products but for Defendant's unlawful conduct. To the extent applicable, reliance may be presumed in these circumstances.

118.   Plaintiff and members of the Class were damaged by reason of Defendant's misrepresentations and omissions alleged herein.

119.   Defendant intended its misrepresentations or omissions to induce Plaintiff and members of the Class to purchase Defendant's BPO Products, or it had reckless disregard for the same.

26

120.    As a direct and proximate result of Defendant's acts and omissions described herein, Plaintiff and members of the Class have suffered harm and will continue to do so.

121.    Defendant's misrepresentations or omissions were material and a substantial factor in the decision of Plaintiff and members of the Class to purchase Defendant's BPO Products.

122.    Defendant intended its misrepresentations or omissions to induce Plaintiff and members of the Class to purchase its BPO Products or had reckless disregard for same.

123.    But for these misrepresentations (or omissions), Plaintiff and members of the Class would not have made purchases of Defendant's BPO Products.

124.    To the extent applicable, Plaintiff and members of the Class were justified in relying on each of Defendant's misrepresentations and omissions. The same or substantively identical misrepresentations and omissions were communicated to each member of the Class through, *inter alia*, product labeling and packaging, as well as Defendant's marketing and promotional material. No reasonable consumer would have purchased Defendant's BPO Products but for Defendant's unlawful conduct. To the extent applicable, reliance may be presumed in these circumstances.

125.    Plaintiff and members of the Class were damaged by reason of Defendant's misrepresentations or omissions alleged herein.

**COUNT V: NEGLIGENT MISREPRESENTATION AND OMISSION**

126.    Plaintiff realleges and incorporates paragraphs 1 through 75 above as if fully set forth herein and further alleges:

127.    Defendant had or undertook a duty to accurately represent the ingredients of its BPO Products.

128.    Defendant failed to exercise ordinary care in making representations (or in failing to disclose facts) concerning the ingredients of its BPO Products.

129.     Defendant negligently misrepresented or omitted facts regarding the ingredients of its BPO Products.

130.     Defendant's misrepresentations or omissions regarding the ingredients of its BPO Products occurred in the products' labeling and packaging as well as in the marketing and promotional material for its BPO Products.

131.     Defendant's statements were false at the time the misrepresentations were made (or at the time omissions were not made).

132.     Defendant knew, or reasonably should have known, that its representations alleged herein were materially false or misleading, or that omissions of material facts rendered such representations false or misleading. Defendant also knew, or had reason to know, that its misrepresentations and omissions would induce Plaintiff and the members of the Class to purchase its BPO Products.

### COUNT VI: VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

133.     Plaintiff realleges and incorporates paragraphs 1 through 75 above as if fully set forth herein and further alleges:

134.     The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA") prohibits "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

135.     During the relevant period, Defendant committed one or more unconscionable or deceptive acts or unfair practices proscribed and punishable by FDUTPA, and it harmed Plaintiff and each member of the Proposed Class by such violative acts or practices.  Plaintiff and each member of the Proposed Class has been damaged as a result.

136.     Plaintiff and each member of the Proposed Class is a "consumer" and "[i]nterested

party or person within the meaning of Fla. Stat. § 501.203(6) and a "person" as envisioned in Fla. Stat. § 501.211.

137.    Defendant engaged in "[t]rade or commerce" within the meaning of Fla. Stat. § 501.203(8), during the relevant time period.

138.    During the relevant period and as detailed further herein, Defendant engaged in unconscionable, unfair and/or deceptive acts or practices in commerce in violation of the FDUTPA by knowingly concealing or failing to disclose the actual or likely presence of benzene in its BPO Products—which constitutes unfair, deceptive, misleading, or otherwise unconscionable acts and practices proscribed and punishable by FDUTPA.

139.    If and to the extent required, Plaintiff has provided Defendant with notice of her claim for herself and all others similarly situated.

140.    To the extent applicable, Plaintiff and members of the Class were justified in relying on Defendant's misrepresentations and omissions. The same or substantively identical misrepresentations and omissions were communicated to each member of the Class through, *inter alia*, product labeling and packaging, as well as Defendant's marketing and promotional material. No reasonable consumer would have purchased Defendant's BPO Products but for Defendant's unlawful conduct. To the extent applicable, reliance is demonstrated in these circumstances.

141.    Plaintiff and each member of the Proposed Class have been harmed as a direct and proximate result of Defendant's FDUTPA violations, and they seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendant from continuing its fraudulent business practices. The damages sought are ascertainable, uniform to the Class and can be measured and returned to the Class members.

## PRAYER FOR RELIEF

For these reasons, Plaintiff prays for the following judgment:

A.      An order certifying this action as a class action;

B.      An order appointing Plaintiff as Class Representative, and appointing undersigned counsel as Class Counsel to represent the Class;

C.      A declaration that Defendant is liable under each and every one of the above enumerated causes of action;

D.      An order awarding appropriate preliminary and/or final injunctive relief against the conduct of Defendant described above;

E.      Payment to Plaintiff and Class Members of all damages, exemplary or punitive damages, and/or restitution associated with the conduct for all causes of action in an amount to be proven at trial, including but not limited to the full amounts paid for the BPO Products; and/or the costs to replace or return the BPO Products;

F.      An award of attorneys' fees, expert witness fees, and costs, as provided by applicable law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the Class Members;

G.      An award of statutory penalties to the extent available;

H.      Interest as provided by law, including but not limited to pre-judgment and post judgment interest as provided by rule or statute; and

I.      Such other and further relief as this Court may deem just, equitable, or proper.

## JURY TRIAL DEMAND

Plaintiff demands a trail of this action by jury.

Dated May 9, 2024

/s/ Matthew S. Mokwa
Matthew S. Mokwa (FL# 47761)
Jason R. Fraxedas (FL# 63887)
**THE MAHER LAW FIRM, P.A.**
271 W. Canton Ave., Suite 1
Winter Park, FL 32789
Phone:  (407) 839-0866
Fax:  (407) 425-7958
mmokwa@maherlawfirm.com
jrfraxedas@maherlawfirm.com

AND

/s/ Christopher B. Hood
Christopher B. Hood (ASB 2280-S35H)
(application for admission
*pro hac vice* to be filed)
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue N
Birmingham, AL 35203
Telephone: 205-326-3336
Facsimile: 205-314-5919
chood@hgdlawfirm.com

**Attorneys for Plaintiff and Proposed Class**